UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

5:17-MJ-99

**IN THE MATTER OF THE SEARCH OF:**

A cellular phone described in Attachment A

AFFIDAVIT IN SUPPORT
OF APPLICATION FOR
SEARCH WARRANT

STATE OF SOUTH DAKOTA   )
                        )
COUNTY OF PENNINGTON    )

I, Tyler Vose, Special Agent of the Federal Bureau of Investigation FBI being duly sworn, states as follows:

1. I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I have been a Special Agent with the FBI since May 2011. Since that time I have been assigned investigative responsibilities in the areas of public corruption in the Detroit and San Juan Field Offices, as well as Indian Country matters. I am currently assigned to the Rapid City Resident Agency of the Minneapolis Field Division, which is located in the District of South Dakota. Prior to being employed as an FBI Agent, I served as a Human Intelligence Collector with the United States Army. In addition to traditional combat duties, I conducted military source operations and interrogations on suspected members of Al-Qa'ida and other radical Islamic terrorist/insurgent groups in Iraq.

1

3. The information set forth below is based upon my knowledge of an investigation conducted by the FBI and the investigation of other law enforcement agents and officers. I have not included each and every fact obtained pursuant to this investigation, but have set forth those facts that I believe are essential to establish the necessary probable cause for the issuance of the search warrant.

4. I make this affidavit in support of an application for a search warrant for a cellular phone provided by Brandon Yellow Hawk, described in Attachment A, for the items listed in Attachment B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 1111(a), 2 and 1153, First Degree Murder, 18 U.S.C. § 924(c)(1)(A)(iii), Discharge of a Firearm During a Crime of Violence, and 18 U.S.C. § 4, Misprision of a Felony (hereinafter Target Offenses) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID's.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence of violations of 18 U.S.C. §§ 1111(a), 2 and 1153, First Degree Murder, 18 U.S.C. § 924(c)(1)(A)(iii),

2

Discharge of a Firearm During a Crime of Violence, and 21 U.S.C. §§ 841(a), Possession with Intent to Distribute a Controlled Substance (hereinafter Target Offenses) are present in Attachment A for evidence, contraband, or fruits of these crimes, as further described in Attachment B.

**PROBABLE CAUSE**

7. During the weekend of May 27, 2017, Christopher Janis (hereinafter "Chris") was visiting family in South Dakota. According Cheryl Janis (Chris's cousin), Chris had "hydro" pills to sell. According to my understanding of Cheryl's statement and my training and experience, "hydro" pills is a reference to hydrocodone, a prescription medication that is a Schedule II controlled substance.

8. Using text messaging and Facebook messaging, Cheryl facilitated a meeting between Chris and Scott Benson (hereinafter "Scott") for the purpose of Scott purchasing hydrocodone pills from Chris. Chris parked at a driveway approach approximately two miles north of Sharps Corner, SD, on the east side of BIA 27, near Thunder Valley. Chris was driving a 2000 tan Chrysler Town & Country minivan. Cheryl was sitting in the front passenger seat of Chris's vehicle. Benson arrived in a 2004 silver Pontiac Bonneville.

9. As directed by Cheryl in the aforementioned text message, Scott entered Chris's vehicle and sat in the rear passenger seat. Benson introduced himself to Chris, and said he wanted to purchase $600 worth of pills. Chris informed Scott he did not have that many pills to sell. As they were discussing the transaction, a male dressed in a black shirt/sweater and wearing a blue

3

bandanna, exited the Bonneville and walked up to the driver side of the minivan. The male then fired several shots through the window at Chris. Chris yelled at Cheryl to get out of there, and was reaching for his handgun by the console. Cheryl exited the minivan and rolled in to a ditch. She described hearing a bullet whiz by her head, and then laid still. She heard someone shouting at Scott to "get in the fucking car" and she saw Scott jump in the Bonneville and head south toward Sharps Corner.

10. Cheryl ran down the road and yelled for help. Lester (known to the FBI as Lester Swallow) and Jarelle Long Soldier called 911. Oglala Sioux Tribe (OST) Department of Public Safety (DPS) Officer Don Twiss was driving to work when he observed a male slumped over and unresponsive in a gold Chrysler minivan.

11. At approximately 5:45 p.m. to 6:00 p.m. a neighbor observed Clarence Yellow Hawk (a/k/a "Whodi") drive a silver Bonneville matching the description to his mother's residence, 12 Cactus Road (as described in Attachment A). OSTDPS responded and arrested Clarence Yellow Hawk at approximately 6:05 p.m. MST on May 27, 2017. His clothing matched the witness' description of the shooter. Blood was observed inside the Bonneville, which was secured upon Yellow Hawk's arrest. A photo of Yellow Hawk was shown to Cheryl, who identified Yellow Hawk as wearing the same clothing as the person who shot and killed Chris.

12. Scott Benson was interviewed on May 31, 2017. He described events leading up to the meeting with Chris Janis and Cheryl, including

4

shooting his handgun with Yellow Hawk and Jamie Shoulders and the message exchanges with Cheryl. He drove the Bonneville to the meeting location while Yellow Hawk rode in the front passenger seat, and Shoulders was in the back seat. Upon arriving at the incident location, Benson pulled in next to the minivan occupied by Chris and Cheryl. Benson exited the Bonneville and entered the backseat of the minivan. Benson was introduced to Chris by Cheryl and they were making arrangements for Benson to purchase hydrocodone pills from Chris. Benson then recalls seeing Jamie Shoulders appear at Chris' driver side window holding a handgun. Shoulders then fired several shots at Chris through the window before backing away from the minivan. Yellow Hawk then appeared and grabbed the handgun from Shoulders. Yellow Hawk then fired more shots through the window at Chris. At this time, Benson exited the minivan and ran back to the Bonneville. Benson drove the group away in the Bonneville. During the drive, Yellow Hawk and Shoulders were removing some clothing items. Yellow Hawk made a statement to the effect of having "fucked up." Benson informed law enforcement of the location where they had tossed the firearm and other clothing items out the window. On May 31, law enforcement went to this location (off a dirt road near the Yellow Hawk residence) and recovered the firearm.

 13. Shoulders was later interviewed by law enforcement. He reported the same events leading up to the meeting with Chris as Benson. A few minutes after Benson entered the minivan, Yellow Hawk handed Benson's

5

firearm to Shoulders, telling him to go check on Benson. When Shoulders approached the minivan driver's door, he saw Chris's gun on the center console and panicked, firing a shot at Chris' leg. Chris then reached for his gun so Shoulders fired again at Chris' leg then began backing up. Yellow Hawk approached, took the firearm and fired approximately five more shots at Chris.

14. The Bonneville and minivan were searched pursuant to search warrants on May 30, 2017. Among other items, Blazer shell casings were located inside the Bonneville and minivan.

15. On May 30, 2017, your affiant interviewed Clarence's brother, Brandon Yellow, while he was incarcerated at the Adult Offender's Facility in Pine Ridge, South Dakota. During that interview, Brandon advised that he knew his brother Clarence was a drug dealer and that Clarence had recently purchased a cellular telephone in Rapid City a couple days before the shooting death of Chris Janis. Through the acquisition by subpoena of toll records on Brandon's cellular telephone number, it was learned that between May 25, 2017 and May 27, 2017, Clarence sent Brandon 100 text messages, none of which were sent after Chris's death. Brandon sent Clarence 104 text messages during the same time period, none of which were sent following Chris's death. There were six (6) attempted telephonic voice contacts from Clarence to Brandon within an hour prior to the shooting death of Chris, but none from Brandon to Clarence. Based on training and experience, it is reasonable to believe that most, if not all of the text messages between Brandon and his brother Clarence were retained on Brandon's cellular telephone.

16. During the interview with Brandon, he provided your affiant with verbal and written consent to search his cellular telephone. Brandon also provided a password to access his cellular telephone. When your affiant later attempted to use the password Brandon provided, it was incorrect. On June 15, 2017, your affiant brought Brandon's cellular telephone and the consent to search form to Hollie Strand at the Internet Crimes Against Children (ICAC) taskforce for her to attempt to download all of the data from Brandon's cellular telephone. Strand was unable to access or bypass the password to Brandon's cellular telephone. However, Strand was able to download the content from the micro SD card in Brandon's cellular phone.

17. On June 16, 2017, your affiant retrieved Brandon's cellular telephone from Strand at the ICAC taskforce. Your affiant reviewed the content that Brandon retained on his micro SD card that was inserted into his cellular telephone. There were several self-photographs (aka "selfies") of Brandon, as well a photograph of what appeared to be a clear, crystal substance in a plastic baggie placed on top of a scale that indicated the substance being weighed was 33 grams. Your affiant believes, through his training and experience, that the clear crystal-like substance is methamphetamine. This particular photograph was taken on May 10, 2017 using the same make and model of cellular telephone (ZTE, Z831) of Brandon's cellular telephone. A second photograph, which appeared to be of the same crystal like substance was taken on May 10, 2017.

18. The micro SD card only contained some of the content that would be stored on the cellular phone. A forensic search of the actual device would, in my training and experience, include additional content not accessible from just the micro SD card.

## **TECHNICAL TERMS**

Based on my training and experience, I use the following technical terms to convey the following meanings:

1. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

2. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

3. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

ELECTRONIC STORAGE AND FORENSIC ANALYSIS

Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. This information can sometimes be recovered with forensics tools.

4. *Forensic evidence.* This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each of the DEVICES was used, the purpose of its use, who used it, and when.

5. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

6. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

7. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

8. The process of identifying the exact electronically stored information on storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that

10

can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

9. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

10. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

11. Upon viewing data on the DEVICE obtained pursuant to this warrant, the United States agrees to seek a separate warrant if evidence of other crimes, not the Target Offenses, is located.

### AUTHORIZATION REQUEST

Based on the foregoing, I respectfully submit there is probable cause to believe that the Device described in Attachment A may contain evidence as detailed in Attachment B of the TARGET OFFENSES, committed by Yellow Hawk and others.

WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. 2703(c)(1)(A), it is requested that the Court issue a warrant and Order authorizing agents of the FBI to execute the requested warrant.

Dated this 27 day of June, 2017.

_____
Tyler Vose, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me in person on June 27th, 2017.

_____
Daneta Wollmann
U.S. Magistrate Judge
District of South Dakota